## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CWP Energy Inc., | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: 2:24-cv-49 |
| | ) | |
| v. | ) | |
| | ) | |
| Joshua A. Becker, Curtis Z. Ball, Stephen | ) | |
| D. Mesh, and JJMLB LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## VERIFIED COMPLAINT

Plaintiff, CWP Energy Inc. ("CWP" or "Plaintiff"), by and through its undersigned counsel, Metz Lewis Brodman Must O'Keefe, LLC, files this Verified Complaint against Defendants, Joshua A. Becker ("Becker"), Curtis Z. Ball ("Ball"), Stephen D. Mesh ("Mesh") (collectively, ("Employee Defendants")) and JJMLB, LLC ("JJMLB") (collectively, ("Defendants")) and in support thereof, states as follows:

## NATURE OF THE ACTION

1.      This case involves the Defendants' calculated and deliberate breaches of their contractual and common law duties owed to CWP, among other tortious conduct, resulting in their unlawful and unfair competition.

2.      CWP is a Montreal-headquartered energy trading firm with a satellite office in Pittsburgh, Pennsylvania. The Employee Defendants comprised CWP's Pittsburgh office.

3.      Less than one business day after Defendants received significant bonus payments from CWP, the Employee Defendants unexpectedly and in coordination with one another resigned from their employment. In addition, JJMLB made demand for the return of its $1.3 million contribution to CWP, pursuant to the terms of the JJMLB Commercial Agreement, discussed in more detail *infra*.

4.      The Employee Defendants' withdrawal from CWP was so synchronized and abrupt that CWP was prompted to investigate the nature of their departure.

5.      CWP quickly uncovered incontrovertible proof that as early as August 2023, while still a CWP employee, Becker was knowingly breaching his restrictive covenants, actively soliciting other CWP employees to leave their employment with CWP in an effort to sabotage its operations, and even went so far as to offer to "pay all legal bills" for the employees he was attempting to entice to join him in his own venture – all material breaches of his agreements with CWP. *See* Ex. F.

6.      CWP files the present action to enjoin the Defendants from breaching their restrictive covenants and to recover damages as a result of their unlawful conduct.

7.      More specifically, CWP asserts causes of action for breach of contract, breach of the common law duty of loyalty, violation of the Pennsylvania Uniform Trade Secrets Act, 12 Pa. C.S. § 5301, *et seq*., and the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq*., civil conspiracy, unfair competition, and tortious interference with contractual relations.

8.      As a result of the Defendants' unlawful acts, CWP has sustained substantial injuries for which it seeks appropriate judicial relief including, but not limited to, injunctive relief, recovery of actual damages (including compensatory and consequential damages), punitive damages, statutory damages, pre- and post-judgment interest, costs of court, and attorneys' fees.

## THE PARTIES

9.      CWP is a Canadian incorporated business having its principal office in Quebec and is registered to do, and does, business in the Commonwealth of Pennsylvania.

10.     Upon information and belief, Defendant Becker is an adult individual residing at 521 Ridge Ct., Wexford, PA 15090.

11.     Defendant JJMLB, LLC is a Pennsylvania domestic limited liability company with a registered office at 521 Ridge Ct., Wexford, PA 15090.

12.     Upon information and belief, all members of JJMLB reside at 521 Ridge Ct., Wexford, PA 15090.

13.     Upon information and belief Defendant Ball is an adult individual residing at 6471 Stanton Ave., Pittsburgh, PA 15206.

14.     Upon information and belief Defendant Mesh is an adult individual residing at 75 S 16th St., Pittsburgh, PA 15203.

## JURISDICTION, VENUE, AND APPLICABLE LAW

15.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because one of the claims in this action arises under the laws of the United States.

16.     This Court has supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367 because they form the same case or controversy as CWP's claim under the laws of the United States.

17.     This Court also has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §1332(a) based on complete diversity of citizenship between CWP and all Defendants and because the amount in controversy exceeds $75,000.  CWP is a citizen of Quebec, Canada. Defendants are citizens of Pennsylvania.

18.     This Court has personal jurisdiction over the Defendants as they are all residents of Allegheny County Pennsylvania, Defendants performed their duties and obligations under the applicable contracts in Pittsburgh, Pennsylvania, material breaches of the applicable contracts occurred in Pittsburgh, Pennsylvania, and Defendants committed other tortious acts giving rise to CWP's claims in Pittsburgh, Pennsylvania.

19.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1), (2), and (b) because the Defendants are residents of Allegheny County, Pennsylvania, Defendants performed their duties and obligations under the applicable contracts in Pittsburgh, Pennsylvania, material breaches of the applicable contracts occurred in Pittsburgh, Pennsylvania, and Defendants committed other tortious acts giving rise to CWP's claims in Pittsburgh, Pennsylvania.

20.    Pursuant to F. R. Civ. P. 44.1, CWP provides notice of its intent to raise issues under a foreign country's law.

21.    As set forth in the respective agreements, CWP's breach of contract claims are governed by Quebec law.

22.    CWP's remaining tort claims arise and are governed by Pennsylvania law.

## FACTUAL BACKGROUND

### A.    The Business of CWP.

23.    CWP is a FERC-authorized energy trading firm that operates an energy wholesale business in the physical and financial markets, specifically trading in electricity.

24.    It engages in the purchase and sale of physical and/or virtual energy in the Day-ahead and Real-time Markets of various Independent System Operator and Regional Transmission Organizations.

25.    CWP employs approximately 40 individuals and has operations in Montreal, Canada; Pittsburgh, Pennsylvania; Boston, Massachusetts; and New York City, New York.

26.    CWP trades bulk energy in the United States wholesale electricity markets (known as independent system operators) in order to generate returns for investors.

- 4 -

27.     Trading of energy happens on national and international exchanges, such as the Intercontinental Exchange Inc. ("ICE"), the Electric Reliability Council of Texas ("ERCOT"), or PJM Interconnection ("PJM").

28.     CWP makes trades on both national and international exchanges throughout North America.

29.     CWP's trading operations involve comprehensive analyses of market trends, strategic positioning, and efficient trade execution, all of which consists of and/or utilizes proprietary information, to optimize energy transactions and maximize market participation.

30.     As part of its business, CWP employs energy or power traders ("Energy Traders").

31.     Energy Traders buy or sell bulk energy at specific locations through a power grid on a day-to-day basis and then purchase or sell the power to facilities in the real-time market to generate profits.

32.     While Energy Traders may use meteorological data or third-party software to predict energy prices, CWP Energy Traders rely on considerably more than just his or her own technical skill and experience to make successful trades.

33.     CWP Energy Traders, including the Employee Defendants, during the course and scope of their employment, were offered access to proprietary information developed by CWP to augment profitable trading.

**B.     CWP's Proprietary Information.**

34.     The proprietary information the Employee Defendants had access to and utilized includes, but is not limited to, CWP's risk management and Energy Trader behavior analysis processes.

35.    CWP's risk management process provides active and real-time risk assessment which significantly augments the profitability of trades.

36.    Through proprietary information developed over many years, CWP provides its Energy Traders with trader behavior analysis, which includes daily feedback, to better manage drawdowns, portfolios, and trading positions.

37.    CWP has also developed internal trading tools which dramatically enhance the third-party software publicly available to all Energy Traders.

38.    These tools include CWP's proprietary PowerChart & PowerTrade, Tableau risk systems, Similar-day analysis, and continuous risk slack communication channels with automated distribution of information.

39.    In the absence of these tools, the optimization of trading positions would be comprised and CWP's Energy Traders would be far less successful.

40.    These tools are so fundamentally important to CWP's success, that not all CWP have access to these tools, let alone third-parties.

41.    In addition to restricting access to these tools CWP requires all employees with access to execute a confidentiality agreement, maintains a Compliance Manuel and Risk Management Policy which all employees receive and are required to acknowledge, monitors employees downloads, keying, and access, and employes cybersecurity managers dedicated to controlling and protecting its servers which house its proprietary information.

42.    This information, let alone the systems, consist of large quantities of confidential information which is difficult to acquire and even more difficult, if not impossible, to duplicate.

43.    CWP has invested millions of dollars over many years to create its proprietary infrastructure consisting of cutting-edge technology and intelligent risk allocation.

44.     On average, CWP invests $4 million per year to manage its innovative and proprietary system to analyze and execute its trades.

45.     CWP's internal trading behavior and portfolio construction are highly confidential.

46.     Learning how CWP trades would be immensely valuable information to CWP's competitors and cause immeasurable harm to CWP.

**C.     Becker was a trusted senior employee.**

47.     Beginning in the Summer of 2019, Becker served as the Head Energy Trader for CWP's new Pittsburgh office.

48.     As Head Energy Trader, Becker oversaw all energy trades placed through the Pittsburgh office regardless of the location of the actual trade.

49.     Becker had approximately 2 people report to him, and he reported directly to the President of CWP, Alain Brisebois.

50.     Becker was intrinsically involved in the development, strategies, and growth plans of CWP generally, as well as the Pittsburgh Office.

51.     He was responsible for daily trading of ERCOT, PJM, and ICE.

52.     Becker was also responsible for the profitability of the Pittsburgh office.

53.     Given his standing within the company, Becker was privy to confidential, proprietary, and trade secret information regarding CWP's pricing, trading, and risk management models.

54.     Specifically, Employee Defendants had daily, unfettered, access to the comprehensive intelligence of CWP's trading team, including privately held exchanges of information on profitable trades, proprietary risk filters which maximize position profitability, strategies for enhancing trading behavior, and portfolio management.

55. In 2019, Becker executed an Employment Contract (the "<u>Becker Employment Contract</u>")[1] in conjunction with additional salary and his promotion to Head Energy Trader. A true and correct copy of the Becker Employment Contract is attached hereto as **Exhibit "A."**

56. In the Becker Employment Contract, Becker agreed to "act with loyalty and honesty towards the Employer." *See* Ex. A at § 2.1.

57. Becker also agreed that he would not use or disclose CWP's Confidential Information:

> The Employee agrees to refrain, directly or indirectly, from using or disclosing, in any manner whatsoever to any person, any Confidential Information (as defined in Schedule A[2]) with respect to any business of the Employer and its Affiliates.

*Id*. at §2.3.

58. Becker further agreed that during his employment with CWP and for a period of one (1) year after the termination of his employment, he would not, without prior consent of CWP:

> directly or indirectly, . . . (a) solicit customers, suppliers or any other entity having retained or used Employer's services or any of its Affiliates, or having done business with the Employer or any of its Affiliates at any time during the twelve (12) months preceding the end of employment, do business with such customers, suppliers or other entity, terminate their business relationship with the Employer or any of its Affiliates, harm this relationship or limit in any way whatsoever;
>
> **(b) offer employment, seek employment or hiring, or otherwise induce or encourage the termination of employment of, any person employed by the**

---

[1] The Becker Employment Contract "shall be construed and enforced in accordance with the laws in force in the province of Quebec, Canada." *Id*. at §4.4.

[2] Schedule A defines "Confidential Information" to "mean[], in general terms, all information produced by the Employer, its subsidiaries, suppliers or customers, in any form whatsoever, for the purpose of their activities, which is not public and whose disclosure to a third party or the public may cause serious prejudice to the latter; It includes but is not limited to sources of supply, terms and conditions of sales of suppliers, product composition, techniques, procedures and methods of work and marketing of products and services, customer lists (including contact information), price list, procedures, policies, contracts, software, strategies, algorithms and plans, discount policies, as well as details of specific customer needs, internal reports, market studies, periodic and annual financial statements, working conditions of people employed by the company, etc. that may reasonably be of confidential nature or be otherwise than in the course of carrying out its duties under this Contract in the ordinary course of business of the Employer." *See* Ex. A at Schedule A, p. 8.

**Employer** or its Affiliates, at the time of the end of employment, or anyone whose employment ended within six (6) months preceding the date of the end of employment, or act to worsen relations between the Employer or its Affiliates and its employees or that could be harmful to conduct of business of the Employer or its Affiliates.

*Id.* at §2.5 (emphasis added).

59.    In addition, pursuant to the Becker Employment Agreement, Becker agreed that "[a]s long as he is employed by Employer and for a period of three (3) months following the end of the Contract, the Employee undertakes not to take any action without the prior consent of the Employer that is likely to compete directly or indirectly with the Employer's Activities. *Id.* at § 2.6.

60.    In recognition of the significant damages Becker would cause CWP if he engaged in such activities, Becker:

> agrees that if he violates the non-solicitation obligation of this Contract, he shall forthwith pay to the Employer or an Affected Affiliate an amount of one hundred thousand dollars ($100,000 USD) per client and/or employee solicited as damages, and without prejudice to any other remedy of the Employer or an Affiliate.

> The Employee agrees that if he contravenes the non-competition obligation of this Contract, the [Employee] shall promptly pay to Employe or Affected Affiliate, upon request, an amount of one thousand dollars ($1,000 USD) per day in damages, and without prejudice to any other remedy of the Employer or an Affiliate.

*Id.* at § 2.7.

61.    On November 16, 2020, Becker entered into the Commercial Agreement with CWP (the "Becker Commercial Agreement"). A true and correct copy of the Becker Commercial Agreement is attached hereto as **Exhibit "B**."

62.     Under the Becker Commercial Agreement,[3] Becker was given the right to invest and subsequently participate in the profits and losses of CWP's Pittsburgh office and Becker acknowledged he "will derive substantial economic benefits from the transactions contemplated by this Agreement." *See* Ex. B at Recital B and E.

63.     He further agreed, "[s]o that CWP may realize the full value associated with the transaction contemplated by this Agreement, . . . to refrain from competing with CWP in accordance with the terms of this Agreement." *See* Ex. B at Recital F.

64.     The Becker Commercial Agreement unambiguously states, "CWP would not have agreed to pay to [Becker] the amounts set out in this Agreement without [Becker]'s agreement and acceptance of the restrictive covenants set forth in Article 3."

65.     Under Article 3.1 Becker

agrees that during the Restricted Period [of two (2) years], [he] shall not, without the prior written authorization of CWP, either directly or indirectly, on his own behalf or on the behalf of another Person, accept Business in the Geographic Area from any Client or Prospective Client of CWP.

[Becker] agrees that during the Restricted Period [of two (2) years], [he] shall not, without prior written authorization of CWP, either directly or indirectly, on his own behalf or on the behalf of any other person, within the Geographical Area, be engaged in, concerned with or interested in any company or business entity that is engaged in the business competitive to CWP's business.

*See* Ex. B at § 3.1.

66.     Becker also agreed "that during the Restricted Period, [he] shall not, without prior written authorization of CWP, either directly or indirectly, on his own behalf or on the behalf of any other Person, solicit, retain the services or encourage the departure of any Employee of CWP." *See* Ex. B at § 3.2.

---

[3] The Becker Commercial Agreement "is governed by and is to be interpreted, construed and enforce in accordance with the laws of the Province of Quebec and the federal laws of Canada applicable therein, without regard to conflict of law principles." *See* Ex. B at §1.3.

67.    The Becker Commercial Agreement set forth additional covenants regarding CWP's Confidential Information.

68.    Article 3.3 states Becker,

[a]t all times[, must] maintain the confidentiality of all Confidential Information to which he may have had or may have access,

(ii) shall not directly or indirectly at any time

      (1) Use or allow the use of any Confidential Information against the best interests of CWP or without the prior written consent of CWP, or

      (2) disclose, reveal or otherwise make available any Confidential Information to any Person, and

(iii) acknowledges that:

      (1) all Confidential Information in his possession was received by him in confidence, and

      (2) the Confidential Information is vital, sensitive, confidential and proprietary to the Business and CWP and if disclosed, could prejudice significantly the competitive position of CWP.

*See* Ex. B at § 3.3.

69.    In Article 4 of the Becker Commercial Agreement, Becker "acknowledges and expressly agrees that Sections 3.1, 3.2, and 3.3 (hereinafter, the "Undertakings") are fundamental elements of this Agreement for CWP and that CWP would not have entered into this Agreement in the absence of said Undertakings." *See* Ex. B at § 3.4.

70.    He further "acknowledges and expressly agrees that said Undertakings shall by no means prevent him from adequately earning a living . . . [and that] said Undertakings afford reasonable protection to CWP's legitimate interests in the terms of duration, geographic location and with regard to the nature of the Business." *See* Ex. B at § 3.4(b) and (c).

71.    Lastly, Beker "acknowledges that a breach of said Undertakings set out in this Agreement may cause irreparable harm to CWP, for which no adequate remedy at law exists and for which it is impossible to precisely quantify the damages. [Becker] also agrees that in the event any such actual or threatened breach, CWP shall be entitled to obtain any injunctive relief, whether provisional, interlocutory or permanent, the whole to prevent [Becker] from engaging in activities expressly prohibited by this Agreement and may seek and obtain an order that the Restrictive Period be extended by any and all periods during which he is in breach of any such obligations." *See* Ex. B at § 3.4(d).

**D.    Becker is further enriched and integrated into CWP through additional contributions by JJMLB.**

72.    In December 21, 2021, through JJMLB – a Pennsylvania LLC which is believe to be exclusively managed by Becker – entered into a Commercial Agreement[4] with CWP ("JJMLB Commercial Agreement"). A true and correct copy of the JJMLB Commercial Agreement is attached hereto as **Exhibit "C."**

73.    In consideration for additional profit and loss rights, JJMLB agreed to be bound by restrictive covenants identical to those found in the Becker Commercial Agreement. *See* Ex. C, Recitals D-G, §§3.1-3.4.

74.    Becker continued as CWP's Head Energy Trader until December 18, 2023. At that time, he unexpectedly tendered his resignation, simultaneously with Defendants Mesh and Ball.

75.    Becker had access to and learned CWP's confidential, proprietary, and trade secret information including, but not limited to, product and market plans, research and development, technologies, technical information, processes and formulas, business plans, and marketing plans.

---

[4] The JJMLB Commercial Agreement is also "governed by an is to be interpreted, construed and enforced in accordance with the laws of the Province of Quebec and the federal laws of Canada applicable therein, without regard to conflict of law principles." *See* Ex. C at § 1.3.

76.     Becker also had relationships with CWP's employees through, among other things, overseeing the Pittsburgh Office trading and routinely interacting with Montreal based employees to facilitate trades.

**E.     Defendants Ball's and Mesh's duties and obligations.**

77.     Defendants Ball and Mesh were employed by CWP as Energy Traders working out of its Pittsburgh Office.

78.     On January 1, 2022, Ball and Mesh entered into Employment Agreements with CWP (defined respectively as, the "Ball Employment Agreement" and the "Mesh Employment Agreement").[5] True and correct copies of the Ball Employment Agreement and Mesh Employment Agreement are attached hereto as **Exhibit "D"** and **"E."**

79.     Similar to Defendant Becker, Defendant Ball and Mesh agreed to "act with diligence, loyalty and honesty" with regard to CWP, maintain the confidentiality of CWP's Confidential Information, refrain from soliciting CWP's clients and employees, and to refrain from interfering with or competing with CWP during and for a period of one (1) year after, their employment with CWP. *See* Ex. D and E at §§ 7.1, 9.1-9.5, 11.1, 12.1, 13.1, and 14.1.

80.     Defendants Ball and Mesh also expressly "acknowledge[d] and agree[d] that Articles 7, 8, 9, 10, 11, 12, 13 and 14 of this Contract (hereinafter, the "Undertakings") are fundamental elements of this Contract for the Corporation and that the Corporation would not have entered into this Contract in the absence of said Undertakings." *See*, Ex. D and E at § 15.1.

81.     Ball and Mesh further "acknowledge[d] and agree[d] that said Undertakings shall by no means prevent him from adequately earning a living . . . [and that] said Undertakings afford

---

[5] The Ball Employment Agreement and the Mesh Employment Agreement are both "governed an interpreted in accordance with the laws of the province of Quebec." *See* Ex. D & E at § 17.6.

reasonable protection to the Corporation's legitimate interests in terms of duration, geographic location and with regard to the nature of the Activities." *See*, Ex. D and E at §§ 15.2-15.3.

82.     Lastly, Ball and Mesh "acknowledge[d] that a breach of said Undertakings set out in this Contract may cause irreparable harm to the Corporation, for which no adequate remedy at law exists and for which it is impossible to precisely quantify the damages. The Employee also agrees that in the event any such actual or threatened breach, the Corporation shall be entitled to obtain any injunctive relieve, whether provisional, interlocutory or permanent, the whole to prevent the Employee from engaging in activities expressly prohibited by this Contract. The Employee also acknowledges that the Corporation may bring any other appropriate remedy to secure the performance of the obligations set out in this Contract." *See*, Ex. D and E at § 15.4.

**F.      The Defendants conspire and breach their respective agreements.**

83.     Pursuant to the terms of the applicable agreements, CWP made significant year end payments to Becker, Mesh, and Ball on Friday, December 15, 2023.

84.     In addition, Defendant JJMLB received a substantial payment on the same day.

85.     Without warning and on the very next business day, Monday, December 18, 2023, the Employee Defendants resigned from their employment with CWP.

86.     Also on December 18, 2023, JJMLB pursuant to §§ 2.4 and 2.5 of the JJMLB Commercial Agreement demanded return of JJMLB's Contribution Amount, an additional $1.3 million dollars.

87.     Defendants' joint resignation immediately jeopardized CWP's Pittsburgh operations by leaving it completely unstaffed.

88.     Astounded by the Employee Defendants' coordinated resignations, CWP began investigating the circumstances which led to their departure.

89.    CWP has already discovered irrefutable evidence that Defendant Becker and JJMLB have breached their respective agreements with CWP and has reason to believe additional breaches have occurred and continue to occur.

90.    As early as August 2023, Becker was approaching CWP employees with "a supremely quiet question" to gauge whether they had "any [i]nterest in coming with" him "if [he] started his own company." *See*, **Ex. F.**

91.    In order to entice CWP employees to leave, Becker offered to "give [an] upfront stake" in his new venture and clarified this meant they would have an "ownership in the pnl." *See*, Ex. F.

92.    Becker also revealed that Defendants Mesh and Ball were part of his scheme and that he planned for them to come with him and continue working as Energy Traders, but that he needed additional CWP employees to "run all back office." *See*, Ex. F.

93.    Becker further admitted that starting from scratch was tough and that he needed a CWP employee to run that back office. *See*, Ex. F.

94.    By September 2024, Becker was soliciting other CWP employees to run the back office. *See*, Ex. F.

95.    Becker admitted he solicited Guillaume Desnoyers verbally and was targeting at least 5 of CWP's employees to breach their agreements with CWP and unlawfully compete with CWP. *See*, Ex. F.

96.    Even worse than his deliberate disregard for his duties and obligations under the applicable contracts, Becker offered to "pay all legal bills" as additional incentive for CWP employees to knowingly engage in unlawful conduct.

97.     Becker approached and solicited Ball and Mesh to leave their employment with CWP, in material breach of their Employment Agreements, and to wrongfully compete with CWP.

98.     The Employee Defendants conspired to delay their resignation so that they would unjustly receive their year-end payments and further conspired to resign on the same day in order to cause the maximum amount of disruption to CWP's business as possible.

99.     The Employee Defendants emailed themselves proprietary and confidential information of CWP to assist them in their competing venture.

100.    The Defendants are or intend to unlawfully compete with CWP in violation of their restrictive covenants.

101.    The Defendants have been using, disclosing, and misappropriating CWP's confidential, proprietary, and trade secret information to their benefit in violation of the restrictive covenants in the agreements and common law.

102.    Given Becker's plans to start a competing enterprise and employ Mesh and Ball as Energy Traders, the continued use and disclosure of CWP's confidential, proprietary, and trade secret information by Defendants is likely or inevitable.

103.    Defendants' wrongful conduct has caused and is continuing to cause substantial harm to CWP.

## COUNT I
### Breach of Contract – CWP v. Becker

104.    CWP incorporates by reference the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

105.    The restrictive covenants in the Becker Employment Agreement and Becker Commercial Agreement are enforceable.[6]

106.    CWP fully performed its obligations under the Becker Employment Agreement and the Becker Commercial Agreement.

107.    Becker breached his contractual duties to CWP in at least the following ways: soliciting CWP employees to leave employment with CWP, soliciting CWP employees to join him in his new and competing venture, starting a business which will directly compete with CWP, and unlawfully disclosing and/or using the confidential and proprietary information and trade secrets of CWP.

108.    The breaches set forth in the preceding paragraph are each independently material.

109.    Becker's conduct is a direct and proximate cause of damages to CWP in an amount to be established at trial.

110.    Becker will continue to breach his obligations to CWP, and CWP will be irreparably harmed thereby, unless this Court enjoins such activities.

**COUNT II**
**Breach of Contract – CWP v. JJMLB**

111.    CWP incorporates by reference the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

112.    The restrictive covenants in the JJMLB Commercial Agreement are enforceable.

113.    CWP fully performed its obligations under the JJMLB Commercial Agreement. JJMLB breached its contractual duties to CWP in at least the following ways: soliciting CWP employees to leave employment with CWP, soliciting CWP employees to join it in its new and

---

[6] To the extent the Becker Commercial Agreement subsumes any portions of the Becker Employment Agreement due to § 5.2 of the Becker Commercial Agreement or to the extent the Commercial Agreement is ultimately found to be unenforceable, which CWP denies, CWP pleads Becker's breaches in the alternative.

competing venture, starting a business which will directly compete with CWP, and unlawfully disclosing and/or using the confidential and proprietary information and trade secrets of CWP.

114.    The breaches set forth in the preceding paragraph are each independently material.

115.    JJLMB's conduct is a direct and proximate cause of damages to CWP in an amount to be established at trial.

116.    JJLMB will continue to breach its obligations to CWP, and CWP will be irreparably harmed thereby, unless this Court enjoins such activities.

**COUNT III**
**Breach of Contract – CWP v. Mesh**

117.    CWP incorporates by reference the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

118.    The restrictive covenants in the Mesh Employment Agreement are enforceable.

119.    CWP fully performed its obligations under the Mesh Employment Agreement.

120.    Mesh breached his contractual duties to CWP in at least the following ways: soliciting CWP employees to leave employment with CWP, soliciting CWP employees to join Becker/JJMLB's new and competing venture, and joining a company which he knew would directly compete with CWP.

121.    The breaches set forth in the proceeding paragraphs are each independently material.

122.    Mesh's conduct is a direct and proximate cause of damages to CWP in an amount to be established at trial.

123.    Mesh will continue to breach his obligations to CWP, and CWP will be irreparably harmed thereby, unless this Court enjoins such activities.

## COUNT IV
### Breach of Contract – CWP v. Ball

124.     CWP incorporates by reference the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

125.     The restrictive covenants in the Ball Employment Agreement are enforceable.

126.     CWP fully performed its obligations under the Ball Employment Agreement.

127.     Ball breached his contractual duties to CWP in at least the following ways: soliciting CWP employees to leave employment with CWP, soliciting CWP employees to join Becker/JJMLB's new and competing venture, and joining a company which he knew would directly compete with CWP.

128.     The breaches set forth in the proceeding paragraphs are each independently material.

129.     Ball's conduct is a direct and proximate cause of damages to CWP in an amount to be established at trial.

130.     Ball will continue to breach his obligations to CWP, and CWP will be irreparably harmed thereby, unless this Court enjoins such activities

## COUNT V
### Misappropriation of Trade Secrets
### (Pennsylvania Uniform Trade Secrets Act)
### CWP v. All Defendants

131.     CWP incorporates by reference the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

132.     CWP owns confidential, proprietary, and trade secret information related to its business and services.   This information provides the company with a commercial advantage

because it is not generally known in the industry in which CWP conducts business, nor is it readily ascertainable by proper means.

133.    CWP's confidential, proprietary, and trade secret information includes, but is not limited to, research and development, technologies, technical information, business plans, marketing plans, CWP's pricing and business model. This confidential, proprietary, and trade secret information was developed only after CWP expended substantial cost and effort over a period of many years.

134.    CWP has taken reasonable steps to protect its confidential, proprietary, and trade secret information, including, but not limited to, storing its information on password-protected computers, limiting access to only those employees whose jobs require access to sensitive information, including Confidential Information provisions in all employment agreements, and limiting access to its physical locations.

135.    The Defendants have used improper means to misappropriate CWP's confidential, proprietary, and trade secret information by using and disclosing CWP's information for their own advantage and the advantage of their new competing business without CWP's consent.

136.    The Defendants' misappropriation of CWP's confidential, proprietary, and trade secret information has directly and proximately resulted in the Defendants gaining an unfair business advantage in the relevant market without having to expend the effort, time, or resources required to develop such information.

137.    As a direct and proximate result of the Defendants' wrongful acts, CWP has and continues to suffer damages in an amount to be determined at trial.

138.    Defendants have misappropriated or threatened to misappropriate CWP's trade secrets knowingly, willfully, maliciously, intentionally, and in bad faith as to warrant the imposition of punitive damages and attorneys' fees in an amount to be determined at trial.

139.    Unless preliminarily and permanently enjoined, Defendants' acts alleged herein will continue to cause CWP irreparable harm, loss, and injury.

**COUNT VI**
**Misappropriation of Trade Secrets**
**(Defend Trade Secrets Act)**
**CWP v. All Defendants**

140.    CWP incorporates by reference the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

141.    This claim arises under the Defend Trade Secrets Act, 18 U.S.C. § 1831, *et seq.*, which prohibits the misappropriation of trade secrets.

142.    CWP owns confidential, proprietary, and trade secret information related to its business and services. This information provides the company with a commercial advantage because it is not generally known in the industry in which CWP conducts business, nor is it readily ascertainable by proper means.

143.    CWP's confidential, proprietary, and trade secret information includes, but is not limited to, research and development, technologies, technical information, business plans, marketing plans, CWP's pricing and business model. This confidential, proprietary, and trade secret information was developed only after CWP expended substantial cost and effort over a period of many years.

144.    CWP has taken reasonable steps to protect its confidential, proprietary, and trade secret information, including, but not limited to, storing its information on password-protected computers, limiting access to only those employees whose jobs require access to sensitive

information, including Confidential Information provisions in all employment agreements, and limiting access to its physical locations.

145.    The Defendants have used improper means to misappropriate and exploit CWP's confidential, proprietary, and trade secret information for their own advantage.

146.    The Defendants' misappropriation of CWP's confidential, proprietary, and trade secret information was without authorization from CWP.

147.    The Defendants' misappropriation of CWP's confidential, proprietary, and trade secret information has directly and proximately resulted in the Defendants gaining an unfair business advantage in the relevant market without having to expend the effort, time, or resources required to develop such information.

148.    As a direct and proximate result of the wrongful conduct of the Defendants, CWP has and continues to suffer damages in an amount to be determined at trial.

149.    The Defendants' actions were willful and malicious and, on that basis, requires the imposition of exemplary and/or punitive damages in an amount to be determined at trial.

150.    CWP has no adequate remedy at law to compensate it for the ongoing wrongful conduct of the Defendants.

151.    Unless preliminarily and permanently enjoined, the Defendants' acts alleged herein will continue to cause CWP irreparable harm, loss, and injury.

### COUNT VII
**Unfair Competition**
**CWP v. All Defendants**

152.    CWP incorporates by reference the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

153.    The wrongful conduct of the Defendants, as set forth above, constitutes unfair methods of competition and/or unfair and deceptive acts and practices in violation of CWP's rights.

154.    As a direct and proximate cause of the wrongful conduct of Defendants, CWP has suffered incalculable financial loses, imminent and permanent irreparable harm, loss of the confidentiality of its trade secrets and other proprietary and confidential business information, loss of goodwill and other continually accruing damages.

155.    The Defendants' conduct has been intentional, willful, malicious, and in reckless disregard of CWP's rights and, therefore, the imposition of punitive damages is warranted.

156.    The Defendants' conduct, as described above, is contrary to honest industry and commercial practices.

157.    CWP has no adequate remedy at law to compensate it for the ongoing wrongful conduct of Defendants.

158.    Unless preliminarily and permanently enjoined, the acts of Defendants alleged herein will continue to cause CWP irreparable harm, loss, and injury.

## COUNT VIII
### Tortious Interference with Contractual Relationships
### CWP v. All Defendants

159.    CWP incorporates by reference the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

160.    CWP has contractual relations with each of the Defendants.

161.    The Defendants each had knowledge of the Mesh Employment Agreement, the Ball Employment Agreement, the Becker Employment Agreement, the Becker Commercial Agreement and the JJMLB Commercial Agreement (the "Agreements").

162.    Nonetheless, each Defendant intentionally interfered with the employee non-solicitation and non-competition provisions of each agreement.

163.    Because each Defendant knew that their actions violated the restrictive covenants in the Agreements, each Defendant is separately and independently liable for its own tortious conduct.

164.    Defendants have acted without justification or privilege.

165.    As a direct and proximate result of the wrongful conduct of Defendants, CWP has suffered actual and imminent and permanent irreparable harm.

166.    Defendants' conduct has been intentional, willful, malicious, and in reckless disregard of CWP's rights, and therefore, the imposition of punitive damages is warranted.

167.    CWP has no adequate remedy at law to compensate it for the ongoing wrongful conduct of Defendants.

168.    Unless preliminarily and permanently enjoined, the acts of Defendants alleged herein will continue to cause CWP irreparably harm, loss, and injury.

## COUNT IX
### Breach of Common Law Duty of Loyalty
### CWP v. Becker, Mesh, and Ball

169.    CWP incorporates by reference the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

170.    As employees of CWP, the Employee Defendants owed CWP a common law duty of loyalty.

171.    Within the course and scope of their employment with CWP, the Employment Defendants are required to act solely for the benefit of their principal, CWP, in all matters concerned with the agency.

172.    The wrongful conduct of the Employee Defendants, as set forth above, constitutes breaches of the duty of loyalty owed to CWP.

173.    As a direct and proximate result of the wrongful conduct of Defendants, CWP has suffered actual and imminent and permanent irreparable harm.

174.    Defendants' conduct has been intentional, willful, malicious, and in reckless disregard of CWP's rights, and therefore, the imposition of punitive damages is warranted.

175.    CWP has no adequate remedy at law to compensate it for the ongoing wrongful conduct of Defendants.

176.    Unless preliminarily and permanently enjoined, the acts of Defendants alleged herein will continue to cause CWP irreparably harm, loss, and injury.

**COUNT X**
**CIVIL CONSPIRACY**
**CWP v. All Defendants**

177.    CWP incorporates by reference the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

178.    As described above, the Defendants acted with a common purpose to commit unlawful acts.

179.    The Defendants committed overt acts in pursuit of the common unlawful purpose. Namely, encouraging the violation of the restrictive covenants in the Agreements, conspiring to receive year end payments to which they were not entitled to, and jointly resigning to inflict the maximum amount of harm and disruption of CWP's business.

180.    The Defendants intended and did cause harm to CWP.

181.    As a direct and proximate result of the wrongful conduct of Defendants, CWP has suffered actual and imminent and permanent irreparable harm.

182.    Defendants' conduct has been intentional, willful, malicious, and in reckless disregard of CWP's rights, and therefore, the imposition of punitive damages is warranted.

183.    CWP has no adequate remedy at law to compensate it for the ongoing wrongful conduct of Defendants.

184.    Unless preliminarily and permanently enjoined, the acts of Defendants alleged herein will continue to cause CWP irreparably harm, loss, and injury.

**COUNT XI**
**Unjust Enrichment**
**CWP v. All Defendants**

185.    CWP incorporates by reference the allegations set forth in each of the preceding paragraphs as if fully set forth herein.

186.    Unbeknownst to CWP, the Defendants had each materially breached their respective agreement(s) with CWP before the year end payments were due.

187.    Because the Defendants had materially breached the Agreements, each Defendant was not entitled to their respective year end payment.

188.    CWP, therefore, conferred a benefit upon the Defendants to which they were not entitled.

189.    Defendants have realized an enormous financial benefit due to their deceptive and unlawful behavior.

190.    Defendants have accepted and retained said benefit.

191.    It is inequitable for the Defendants to retain their year-end payments when they had materially breached and continued to breach the Agreements and jointly resigned the very next day.

**PRAYER FOR RELIEF**

WHEREFORE, CWP respectfully requests that this Court:

1.      Grant CWP injunctive relief requiring all Defendants to abide by the terms of the restrictive covenants described above, and enjoin and restrain all Defendants from competing with and soliciting CWP employees, using and/or disclosing CWP's confidential, proprietary or trade secret information, unfairly competing with CWP and tortiously interfering with CWP's business relations, until further order of court.

2.      Enter an Order that Defendants are prohibited from using, disclosing or sharing any confidential, proprietary, or trade secret information belonging to CWP;

3.      That all Defendants returns to CWP any confidential, proprietary, and trade secret information provided to or in the possession, custody, or control of Defendants;

4.      That judgment be entered for CWP against Defendants for all compensatory and related damages;

5.      That judgment be entered for CWP against Defendants for punitive damages;

6.      That CWP be awarded all available statutory damages;

7.      That CWP be awarded all of the costs and attorneys' fees it has incurred and will incur in connection with this action pursuant to any applicable statutes; and

8.      For such other and further relief that this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, CWP Energy Inc., demands a trial by jury on all issues so triable.

Dated: January //, 2024                   Respectfully submitted,

 

Brian T. Must, Esquire
(Pa I.D. No.:  49657)
Alison R. Viola, Esquire
(Pa I.D. No.:  324768)
METZ LEWIS BRODMAN MUST O'KEEFE LLC
444 Liberty Ave., Suite 2100
Pittsburgh, Pennsylvania 15222
Telephone: (412) 918-1100
Fax: (412) 918-1199
bmust@metzlewis.com
aviola@metzlewis.com

*Attorneys for CWP Energy Inc.*

VERIFICATION

PROVINCE OF QUEBEC )
) SS:
CITY OF MONTREAL )

    I, Alain Brisebois, am the President of CWP Energy, Inc., and I verify on personal knowledge that the allegations made in this Verified Complaint are true to the best of my knowledge, information and belief.

    This 11th day of January, 2024

*Solemnly declared remotely by Alain Brisebois stated as being located in Montréal, Quebec, before the undersigned Notary Public in Richmond Hill, Ontario on January 11, 2024 in accordance with O Reg 431/20, Administering Oath or Declaration Remotely.*

_____
Alain Brisebois
President of CWP Energy, Inc.

_____
Notary Public

MA LACHELLE ARANDA AREVALO
Licensed Paralegal & Notary Public
in and for the Province of Ontario.
My commission is of unlimited duration.

*No legal advice given, LSO # P15293.*